**SIGNED THIS: March 31, 2020**

_Mary P. Gorman_

_____

**Mary P. Gorman**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 18-71832 |
| ROBERT F. BRADY, Sr., | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| THOMAS J. PLIURA and | ) | |
| PAM H. PLIURA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 19-07011 |
| | ) | |
| ROBERT F. BRADY, Sr., | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

Before the Court, after trial, is an Amended Complaint Objecting to Dischargeability of Debt. Thomas and Pam Pliura claim that a debt owed to them by the Debtor is nondischargeable by reason of false representations made by the

Debtor, both in writing and orally, to obtain a loan of $1 million from them. For the reasons set forth herein, judgment will be entered in favor of the Pliuras and against the Debtor. The debt will be excepted from the Debtor's discharge.

## I. Factual and Procedural Background

Robert F. Brady ("Debtor") filed his voluntary Chapter 7 bankruptcy petition on December 18, 2018. On his Statement of Financial Affairs, the Debtor said that he is involved with two businesses: Pride Homes Inc. d/b/a Keystone Homes ("Pride Homes") and Clinton RCC LLC ("Clinton RCC"). He described Pride Homes as engaged in residential and commercial construction and said that he is president of the corporation but owns no stock in it. He described Clinton RCC as a real estate holding and management company that commenced doing business in 2012. He claimed that he is involved in the business but does not have a member interest. On his Schedule E/F: Creditors Who Have Unsecured Claims, the Debtor listed Thomas and Pam Pliura as being owed $1,808,431 relating to a "Promissory Note - Business." The Debtor received his discharge on April 16, 2019.

On April 4, 2019, Thomas and Pam Pliura timely filed this adversary proceeding seeking a determination of the dischargeability of the debt owed to them by the Debtor. The Pliuras' First Amended Complaint, filed August 7, 2019, alleged that the debt owed to them was obtained by fraud and misrepresentation and is therefore nondischargeable. According to the Pliuras, the Debtor obtained a $1 million loan from them by misrepresenting the nature and value of his purported ownership interest in real estate that was to secure the loan.

Specifically, the Pliuras alleged that the Debtor represented in writing that he and his brother, Edward Brady, owned apartment and condominium buildings at 1700, 1708, 1710, and 1712 Rockingham Drive in Normal, Illinois ("the Rockingham properties"), and that the Rockingham properties were free and clear of liens. Both representations were subsequently found to be false. In reliance on those representations, the Pliuras said that they lent the Debtor and his brother $1 million, which is still owed along with accrued interest in excess of $800,000.

The Debtor answered the amended complaint denying many of the material allegations, although he did admit borrowing the money from the Pliuras and signing the documents that contained the representations of his free-and-clear ownership of the Rockingham properties. The case was tried on January 30, 2020.

The Pliuras' attorney called the Debtor as the first witness. The Debtor said that he had a masters degree in business administration and had begun working in banking when he finished his education. He said that while he was in banking, he had worked as a credit analyst reviewing financial documents for commercial loan approvals. After several years working in banking, he joined the family business of Brady Homes in 1992. He described Brady Homes as a residential construction business started by his father and later owned by him and his brothers, Edward and William. He said that, over the years, Brady Homes had built as many as 1500 homes in the Bloomington/Normal, Illinois, area and that it also built and managed apartments and condominiums. The Debtor also acknowledged that, through his work with Brady Homes and his partial ownership of a title company, he was familiar with the documentation needed to transfer title to property and the concept of clear title.

The Debtor also described two other businesses he owned with his brothers: Pinehurst Development Inc. ("Pinehurst") and Brew of Illinois LLC ("Brew"). He described Pinehurst as an entity formed to develop residential properties and to hold investment properties. He said that he believed that he and his two brothers each had owned a one-third interest in Pinehurst in 2010 but that, by the time of the trial, he had no current interest in the company and believed it was defunct. He described Brew as a company formed to hold investment properties and acknowledged that, in 2010, he also owned a one-third interest in the company. His brothers owned the balance of Brew, and, at the time of trial, he was uncertain of the status of the company.

Referring to Thomas Pliura as "Dr. Pliura," the Debtor said that they had been acquainted since 1992. He identified a document labeled "Standard Promissory Note" ("Note") signed by himself and his brother, Edward Brady, evidencing their joint promise to pay to Dr. Pliura and his wife, Pam Pliura, the sum of $1 million plus interest at the rate of 6%. The Note was dated October 29, 2010, and provided that principal and interest were due to be paid in full by May 2, 2011. He confirmed that the Note was executed based on a loan made by the Pliuras to him and his brother. He also identified another document labeled "Security Agreement" that also had been signed by him and his brother on October 29, 2010. The Security Agreement purported to grant a security interest in favor of the Pliuras on the Rockingham properties. Each of the Rockingham properties was described by address, tax identification number, and by the number of units contained in each building on the properties.

The Security Agreement referred to the Debtor and Edward Brady

- 4 -

collectively as "Makers" and to all of the Rockingham properties collectively as the
"Collateral." The Security Agreement provided that "Makers stipulate and
represent they are the sole, legal and equitable owner of the Collateral." Further,
"Makers" warranted that "[n]o other security agreement, financing statement, or
other security instrument covering the Collateral exists." Additionally, "Makers"
warranted that they "will not create or allow any other security interest or lien on
the Collateral[.]"

The Debtor admitted that the representations he made in the Security
Agreement were not true and agreed that the representations were, in fact,
misleading and false. All of the Rockingham properties were owned by Pinehurst
and Brew, not by the Debtor and his brother. And, at the time the Security
Agreement was signed, the Rockingham properties described as the Collateral
were all encumbered by mortgages to Busey Bank. The Debtor discussed an
appraisal that had been ordered at the time of the transaction with the Pliuras
and acknowledged that, although the appraisal was not received until after the
transaction, it reflected that the Rockingham properties had a collective value of
approximately $1.6 million. He initially said that the Busey Bank mortgage on the
Rockingham properties, at the time, was $1.3 million but later admitted that the
Rockingham properties were cross-collateralized to secure other loans. When
Busey Bank accepted a deed in lieu of foreclosure with respect to all of the
properties in which the Debtor and his brothers were involved in mid-2011, they
owed Busey Bank $6 million and had total real estate collateral with a value of
only $3 million. With respect to the Rockingham properties, he admitted that he
and his brothers were "underwater" and, at the time they entered into the loan

transactions with the Pliuras, they were in a "financial crisis."

With respect to the actual loan transaction with the Pliuras, the Debtor denied having a clear recollection of his conversations with Dr. Pliura and suggested that Dr. Pliura spoke more frequently with his brothers. He acknowledged knowing that Dr. Pliura wanted collateral for the loan he and his wife had agreed to make and that the Pliuras expected to be protected by the equity in the property in which they intended to take a secured interest. He said that he thought the Rockingham properties had been selected by Dr. Pliura as collateral because there was equity in those properties. He did not, however, have any recollection of actually informing Dr. Pliura that there were mortgage liens against the properties and that the properties were cross-collateralized and actually "underwater." He said that a spreadsheet of all of the Bradys' properties and mortgages had been prepared at the time and that he believed that Dr. Pliura had been given a copy of the document. He could not, however, produce the document, and he admitted that he had not personally given a copy to Dr. Pliura. He thought one of his brothers had given Dr. Pliura a copy of the spreadsheet.[1] The Debtor said that the money borrowed from the Pliuras was used to pay the bills of Brady Homes and that he had no idea of how the money was going to be paid back after it was borrowed. He admitted that he was aware that the Pliuras expected to be repaid and that they intended to take a lien on the Rockingham properties to make certain that they would be paid.

Although the Debtor also denied any recollection of having read the Security

---

[1] Neither William Brady nor Edward Brady was called as a witness by the Debtor to verify this statement.

Agreement before he signed it, he admitted that Dr. Pliura had emailed copies of the draft documents to his brother the day before the loan closing and that his brother had forwarded the documents to him. He said that portions of the documents were blank when he received them before closing but acknowledged that the pre-printed portions of the documents containing the representations of free-and-clear ownership were in the copies received by him before closing. He also identified emails he had exchanged with Dr. Pliura after receiving the draft documents but before the closing regarding some of the terms of the Note. He acknowledged that the documents were fully completed before he signed them and that the handwriting on the documents, other than the signatures of himself and his brother, was that of Dr. Pliura.

Dr. Thomas Pliura also testified. Dr. Pliura stated that he had obtained his medical degree in 1983 and a law degree in 1987. He initially practiced emergency medicine but currently practices through an urgent care clinic. He also maintains a law practice that initially handled healthcare-related defense cases but now does more plaintiffs' work. He also works on some prisoner cases through appointments from the District Court. He does not handle real estate or transactional legal matters.

Dr. Pliura testified that he had known the "Brady boys"—William, Edward, and the Debtor, Robert—for many years. He said that, in August 2010, while he was on a fishing trip in Canada, he received a phone call from William Brady, who was then an Illinois state senator and the Republican candidate for Illinois governor. Sen. Brady advised Dr. Pliura that he and his brothers were having financial difficulties and needed to borrow $1 million quickly. Dr. Pliura was told

by Sen. Brady that the money was needed to pay subcontractors who had done work for the Bradys' construction company and were threatening to go to the newspapers about the lack of payment. Sen. Brady was concerned about the adverse publicity on his campaign. Dr. Pliura told Sen. Brady that he could not make any loan until he returned from his vacation.

After he returned from his trip, Dr. Pliura met with Sen. Brady and talked to Edward Brady and the Debtor about the requested loan. He learned from them that there was a great urgency for them to borrow money to avoid the filing of liens by unpaid subcontractors and to avoid adverse publicity that might impact Sen. Brady's gubernatorial campaign. To satisfy their immediate needs, Dr. Pliura agreed to lend the Bradys $350,000 and then to determine if there was collateral to secure a larger loan. He also wanted to see appraisals before lending any more money. On September 24, 2010, the Pliuras lent the Debtor and Edward Brady $350,000, and the Debtor and Edward Brady signed a promissory note for that amount plus 6% interest to be paid back by March 25, 2011. Dr. Pliura said that Sen. Brady did not sign the note due to political considerations.

Thereafter, Dr. Pliura continued to talk with the Bradys, including the Debtor, who he described as the "go-to guy" in the Bradys' businesses. Dr. Pliura said that it was his idea to have real estate as collateral for the loan and that he was advised by the Bradys that the Rockingham properties were worth more than $1 million, had no mortgages against them, and generated significant rental income. He said that Sen. Brady did not want a mortgage recorded against the Rockingham properties by the Pliuras, again for political reasons. He decided to prepare the Security Agreement in order to obtain a lien on the Rockingham

properties. He said that the loan would not have been made by him and his wife without the Bradys pledging what he believed was unencumbered real estate to secure the loan.

Dr. Pliura identified the Note and Security Agreement that were signed by the Debtor and Edward Brady on October 29, 2010. He said that he had prepared the documents and emailed drafts to Edward Brady. He later received an email from the Debtor asking about how the earlier $350,000 note would be treated in view of the fact that the new documents referred to a $1 million loan but only an additional $650,000 was expected to be advanced. Dr. Pliura replied that the old note would be cancelled and the entire debt rolled into the new transaction. He also said that he had received some old appraisal information prior to the loan closing but did not see the most current appraisal until April 2011.

The closing of the loan took place at the Bradys' business offices in Bloomington, Illinois, on October 29, 2010. Dr. Pliura said that all three of the Bradys were present and he believed that his wife was also present. He filled in the blanks on the Security Agreement at the closing including the addresses, tax identification numbers, and descriptions of the Rockingham properties. He said that he saw all three of the Bradys review the final documents at the closing before the documents were signed by the Debtor. Dr. Pliura testified that, at the closing, he made the request that the wives of the Debtor and Edward Brady sign the Note. He had been advised to make the request by his accountant. He said that all three of the Bradys, including the Debtor, specifically replied to that request by declining to have their wives sign, saying that it was not necessary because the Pliuras were receiving a lien on collateral with a value that more than

covered the amount of their loan. He recalled the Debtor and his brothers all assuring him that, based on the value of the collateral, the Pliuras were protected. Based on those assurances, he proceeded with the loan, and the documents were signed.

Dr. Pliura said that one payment was tendered by the Bradys on the Note, but the check bounced. No other payments were ever tendered. In April 2011, he retained an attorney to look into collection of the Note and learned, after the attorney ordered and received a title search, that the Rockingham properties were owned by Pinehurst and Brew and were fully encumbered to Busey Bank. He contacted the Debtor for information and received current appraisals showing the Rockingham properties were valued at $1.68 million. He also learned that Busy Bank's mortgages against the Rockingham properties totaled $2.7 million. At that point, he felt that he had been "hoodwinked" and was "out of the money."

The Bradys and Dr. Pliura exchanged emails about the situation, but the Pliuras never received any payments, and the Bradys did not sign the additional documents prepared by the Pliuras' attorney to secure the Pliuras' lien on the Rockingham properties. Dr. Pliura learned in July 2011 that the Rockingham properties had been transferred to Busey Bank through a deed in lieu of foreclosure. He said that he had requested the Bradys to provide him with a spreadsheet of their holdings but they had never provided that information, either before or after the loan transaction closed. Dr. Pliura said that he made numerous requests for payment from the Debtor over the years but was repeatedly told that the market was sour and the Bradys were waiting for the market to turn around. In 2018, he filed a state court lawsuit to collect on the Note, and the Debtor then

filed his bankruptcy.

Under cross-examination, Dr. Pliura admitted that he could not recall if it was the Debtor who told him that the Debtor owned the Rockingham properties personally with his brother. He said, however, that he assumed that they owned the properties personally and he was not corrected by the Debtor when he prepared the Security Agreement to reflect that ownership. He admitted that he was aware that the Bradys were in financial trouble and that the real estate industry was generally not doing well in 2010. But he said that he assumed the Bradys' situation was a "blip" as he continued to see them socializing at the country club, and he believed that they would not cheat him due to their many years of friendship. He denied having any idea that it might be unbelievable that the Bradys would have unencumbered properties notwithstanding their financial situation. He admitted that he was "stupid" for not retaining counsel to represent him in the loan transaction.

At the close of testimony, the attorneys for both parties presented arguments and citation to authority. The matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The determination of the dischargeability of a particular debt is a core proceeding. 28 U.S.C. §157(b)(2)(I). The issues here arise from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may

therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

The Pliuras brought their adversary complaint against the Debtor based on allegations of misrepresentations made both orally and in writing. They relied on §523(a)(2), which provides, in relevant part:

> (a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . .
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>>
>> (B) use of a statement in writing—
>>
>>> (i) that is materially false;
>>>
>>> (ii) respecting the debtor's or an insider's financial condition;
>>>
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>
>>> (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. §523(a)(2)(A), (B).

The Pliuras' First Amended Complaint sets forth two counts, one under

§523(a)(2)(A) and the other under §523(a)(2)(B). Under §523(a)(2)(A), the Pliuras were required to prove that, in connection with their loan transaction: (1) the Debtor made a false representation or omission; (2) the Debtor knew the misrepresentation was false or made the representation with reckless disregard for the truth; (3) the Debtor made the misrepresentation with intent to deceive; and (4) they justifiably relied on the misrepresentation in making the loan. *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010); *Goldberg Securities, Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 525 (7th Cir. 1992). The justifiable reliance required of the Pliuras would not include a duty to investigate unless the falsity of the misrepresentations was readily apparent; a lender cannot turn a blind eye on patently false representations. *Field v. Mans*, 516 U.S. 59, 71 (1995); *Ojeda*, 599 F.3d at 717.

To prevail under §523(a)(2)(B), the Pliuras were required to prove that the Debtor submitted to them, as part of their loan transaction, a written statement (1) that was materially false; (2) that included information respecting the Debtor's financial condition; (3) that they reasonably relied on in extending the loan; and (4) that the Debtor made or published with intent to deceive. *Matter of Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995); *Financial Pacific Leasing, LLC v. Kilaru (In re Kilaru)*, 552 B.R. 806, 810 (Bankr. N.D. Ill. 2016). The Pliuras' burden of proof under both §523(a)(2)(A) and §523(a)(2)(B) was a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290 (1991).

Some courts have suggested that the provisions of §523(a)(2)(A) and §523(a)(2)(B) are mutually exclusive. *Alford v. Cassel (In re Cassel)*, 322 B.R. 363, 371 (Bankr. C.D. Ill. 2005) (Perkins, J.) (citations omitted); *see also Am. Nat'l Bank*

-13-

*v. Dalcourt (In re Dalcourt)*, 354 B.R. 868, 874 (Bankr. N.D. Iowa 2006). False statements relied upon by the creditor are, as a matter of substance, either respecting a debtor's financial condition or they are not. If they are, then they are only actionable if they were made in writing, and the action may be brought only under §523(a)(2)(B). Thus, the issue of whether the statements at issue in any particular case are respecting a debtor's financial condition is key to determining whether an action has been properly brought and whether a creditor has met the required burden of proof.

Guidance on whether a statement is respecting a debtor's financial condition comes from the United States Supreme Court's decision in *Lamar, Archer & Cofrin, LLP v. Appling*, ___ U.S. ___, 138 S. Ct. 1752, 201 L. Ed. 2d 102 (2018). In *Appling*, the Court found that all of the words of the statute should be given their "ordinary meaning" and that the word "respecting" should be read expansively. *Id.* at 1759-60. The Court declined to limit statements "respecting the debtor's . . . financial condition" to only include statements that provide extensive information about all, or at least many, aspects of a debtor's financial condition. *Id.* Instead, the Court found that "a statement about a single asset" could be a statement respecting a debtor's financial condition. *Id.* at 1761. The Court found that "[a] single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is . . . able to repay a given debt or not." *Id.*

Based on *Appling*, it is clear that the misrepresentations made by the Debtor here were with respect to his financial condition. The misrepresentations related

to his ownership of real estate and whether there were liens against that property. The information was provided in support of a loan request to establish the likelihood that the loan, if made, would be repaid. For those reasons and as explained in more detail below, the evidence presented at trial supports a finding of nondischargeability under §523(a)(2)(B) but not under §523(a)(2)(A).

*A. The Debtor's obligation to the Pliuras is nondischargeable under §523(a)(2)(B).*

The Debtor does not dispute that he owes the Pliuras $1 million plus accrued interest. He borrowed the money, signed the Note, and has not paid the debt. The Note covers the entire $1 million transaction; it includes the $650,000 advanced when the Note was signed and the $350,000 advanced earlier. The $350,000 obligation was renewed and extended by the execution of the Note and is therefore properly included in the nondischargeable debt even though the written misrepresentations were made after the initial $350,000 loan transaction. *See* 11 U.S.C. §523(a)(2).

There also is no dispute that the Debtor made materially false statements in writing respecting his financial condition as part of his loan transaction with the Pliuras. He signed the Security Agreement that contained express representations that he owned the Rockingham properties with his brother and that the Rockingham properties were not encumbered by liens. Both statements were false, and he admitted they were false at trial. He also acknowledged that he knew that Dr. Pliura was insisting on real estate collateral as a condition of finalizing the $1 million loan and, accordingly, he knew that the information he was providing about the Rockingham properties and the warranties in the

Security Agreement were material to the transaction. The Debtor did not seriously contest this element of proof at trial.

The Pliuras also met their burden of proof on the issue of whether the Debtor made the false written statements with intent to deceive. The evidence established that the Debtor intended to deceive the Pliuras into believing that they were receiving a lien on free-and-clear real estate collateral with a value sufficient to fully secure their loan. Although intent may be proven by direct evidence, developing such proof can be a difficult task because wrongdoers rarely admit to their wrongful conduct. Accordingly, "wrongful intent may 'logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan.'" *Sheridan*, 57 F.3d at 633 (citing *In re Kimzey*, 761 F.2d 421, 424 (7th Cir. 1985)). Further, a "debtor's intent to deceive may also be demonstrated by showing reckless indifference to, or reckless disregard for, the accuracy of information" presented in documents tendered in support of a loan request or in the actual loan documents. *Webster Bank v. Contos (In re Contos)*, 417 B.R. 557, 565 (Bankr. N.D. Ill. 2009) (citations omitted).

The Debtor admitted that he received the loan documents prepared by Dr. Pliura before the loan closing but says that he does not recall that he read them. He admitted at trial, however, that he noticed the documents referred to the $1 million loan and emailed Dr.Pliura for clarification of how the $350,000 prior note would be addressed. That testimony establishes that he at least read parts of the documents. Dr. Pliura's unrebutted testimony was that, at the closing on October 29, 2010, he filled in the Collateral section on the Security Agreement using information about the Rockingham properties that the Bradys provided to him,

-16-

and that he saw all of the Bradys, including the Debtor, read and review the final documents before the Debtor signed them. The Court did not find the Debtor's testimony that he may not have read the documents credible. And, in any event, if he signed documents containing express but false warranties that he knew the Pliuras were relying on, then his intent to deceive is established by his admitted reckless disregard and indifference to the accuracy of his warranties.

A key piece of evidence on the issue of the Debtor's intent to deceive was Dr. Pliura's unrebutted testimony that, when he asked at the closing for the wives of the Debtor and his brother to sign the Note, he was told by the Debtor and both of his brothers that those signatures were unnecessary because the Rockingham properties provided coverage for the $1 million loan and the Pliuras were fully protected by that collateral. Those representations were clearly false, and the Debtor knew it. The Bradys were underwater on the Rockingham properties, and the Debtor admitted that, due to the cross-collateralization of Busey Bank's loans and mortgages, there was no equity in the Rockingham properties to protect the Pliuras. If Dr. Pliura's recitation of that conversation was wrong, the Debtor could have so testified, but he did not. Thus, the resolution of the question of whether there was intent to deceive is not a close call; the Debtor intended to deceive the Pliuras regarding his ownership and the free-and-clear status of the Rockingham properties that the Piluras had been led to believe was available to secure their loan. There is no question, based on Dr. Pliura's unrebutted testimony, that if the Debtor and his brothers had told the truth—that they were totally underwater on their real estate holdings and had nothing to offer the Pliuras as collateral—the loan would not have been made on October 29, 2010. The truth was not told,

however, and the loan was made.

The final element of proof required of the Pliuras was that they reasonably relied on the misrepresentations of the Debtor in making the loan. Reasonable reliance is a higher standard than justifiable reliance, and the heightened requirements of §523(a)(2)(B) serve to balance the interests of both debtors and creditors. *Appling*, 138 S. Ct. at 1763-64. Whether a creditor's reliance was reasonable is decided on a case-by-case basis. *Matter of Bonnett,* 895 F.2d 1155, 1157 (7th Cir. 1989). Frequently, courts consider a creditor's compliance with its own standard lending practices along with industry standards and customs when evaluating whether reliance in a particular case was reasonable. *Colchester State Bank v. Phillips (In re Phillips)*, 367 B.R. 637, 645 (Bankr. C.D. Ill. 2007) (Perkins, J.). Here, of course, the Pliuras are not traditional lenders and have no standard practices or any relation to the lending industry; it would be unfair and inappropriate to evaluate their reliance as though they were commercial bankers. Thus, the Court must evaluate their reliance based on the precept that "reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors[.]" *In re Morris*, 223 F.3d 548, 554 (7th Cir. 2000). But, at the same time, creditors cannot ignore "obvious red flags." *Harris N.A. v. Gunsteen (In re Gunsteen)*, 487 B.R. 887, 902 (Bankr. N.D. Ill. 2013).

In his closing argument, the Debtor's attorney concentrated almost exclusively on this element of required proof. He suggested that there were so many "red flags" surrounding the Bradys' financial condition that the Pliuras should have known that the information they were relying on could not be true.

Likewise, in his cross-examination of Dr. Pliura, the Debtor's attorney questioned Dr. Pliura on how he could have possibly believed that the Bradys had any free-and-clear property to pledge when they were in obvious financial crisis. The defense asserted here by the Debtor—that his lies were so obvious they should not have been  believed—is a tough one to make because it shifts blame from the wrongdoer to the victim. And here, the defense is just not credible. All things considered, the Pliuras' reliance on the representations made by the Debtor was reasonable.

In making the loan, the Pliuras relied on the information that the Rockingham properties were owned by the Debtor and his brother, were valued in excess of $1 million, and were free and clear of liens of other creditors. One of the weaknesses in the Pliuras' proof was that, numerous times in his testimony, Dr. Pliura referred to conversations with the Bradys generally and without specific reference to the Debtor. Likewise, the Debtor admitted knowing that the Pliuras expected their loan to be fully collateralized but denied being the person who gave the Pliuras specific information about the Rockingham properties. Rather, he deflected to his brothers, suggesting that they were the information providers. But the Pliuras did not solely rely on the bits and pieces of information they received from the various Bradys as they put the transaction together. Rather, Dr. Pliura put the information they were relying on in writing, and the Debtor signed that writing.

The Debtor does not deny that he received the draft closing documents before the closing and that those draft documents included the warranties of ownership and free-and-clear title. He also did not deny knowing that the

-19-

description of the collateral on the Security Agreement would be filled in with information regarding the Rockingham properties. Dr. Pliura's unrebutted testimony was that he handwrote the information about the Rockingham properties on the Security Agreement at the closing with Debtor and his brothers present and that, thereafter, the Debtor and his brothers read the Note and Security Agreement before signing. If the documents contained warranties or representations based on incorrect information the Pliuras had received from Edward or William Brady or information the Pliuras had misunderstood, the closing was the time for the Debtor to speak up and disabuse the Pliuras of any misunderstandings. But that did not happen. The Debtor signed the documents confirming the information upon which the Pliuras were relying. The Pliuras' reliance on the Debtor's written confirmation was reasonable and required no further investigation on their part.

Additionally, this Court found Dr. Pliura's testimony on why he made the loan credible and pertinent to the issue of reliance. He had been friends with the Bradys for years; their wives were also friends. He knew that William Brady was a state senator and a candidate for governor and, apparently, he held Sen. Brady in high regard. He knew the Bradys as successful businessmen in the community, and, despite also knowing of their current financial distress and urgent need to borrow money, he had no reason to think that any of the Bradys, including the Debtor, would look him in the eye and lie. The Pliuras reasonably relied on their friendship with the Debtor and the Debtor and his family's good reputation in the community in making the loan.

In making its decision, the Court did consider whether the failure of the

Pliuras to actually secure the Rockingham properties as collateral for their loan with properly recorded documents should defeat their claim.[2] But the Pliuras' loss did not arise from that failure. If they had prepared and the Debtor had signed a mortgage that was subsequently recorded, they would have still been "out of the money" as Dr. Pliura put it. Their loss stems from the Debtor's misrepresentation of ownership and his misrepresentation of the free-and-clear status of the Rockingham properties offered as collateral. Any mortgage the Pliuras might have recorded would have either been outside of the chain of title due to the Debtor's misrepresentation of ownership or would have been behind Busey Bank's cross-collateralized mortgages that exceeded the value of the Rockingham properties.

The Pliuras met their burden of proof on each element of the cause of action, and all of the obligations of the Debtor pursuant to the $1 million Note signed on October 29, 2010, will be excepted from the Debtor's discharge.

*B. The Pliuras did not meet their burden of proof under § 523(a)(2)(A).*

As set forth above, courts often consider §523(a)(2)(A) and §523(a)(2)(B) as mutually exclusive. *Cassel*, 322 B.R. at 371. That may not always be the case, but it is the case here. The serious misrepresentations made by the Debtor were about his financial condition and, because they were reduced to writing, were actionable under §523(a)(2)(B). The other oral misrepresentations made by the Debtor, such

---

[2] Article 9 of the Illinois Commercial Code governs secured transactions and the use of security agreements. *See generally* 810 ILCS 5/9-101. With limited exceptions not applicable here, security agreements may not be used for "the creation or transfer of an interest in or lien on real property[.]" 810 ILCS 5/9-109(d)(11). Rather, recording a mortgage drafted in substantial compliance with the statute is the proper method to obtain and perfect a lien on real property under Illinois law. 765 ILCS 5/11(a).

as his assertion that his wife's signature on the Note was not necessary because the Pliuras were protected by taking the Rockingham properties as collateral, were, in essence, also about his financial condition. Thus, the oral misrepresentations are not actionable, in and of themselves, under §523(a)(2)(A), although they were properly considered on the issue of the Debtor's intent to deceive. Because the Pliuras prevailed under §523(a)(2)(B), they cannot also prevail under §523(a)(2)(A) under the circumstances and with the evidence presented here. Judgment for the Debtor will be entered on the §523(a)(2)(A) cause of action.

### IV. Conclusion

The Pliuras met their burden of proof on all issues of their cause of action under §523(a)(2)(B). The Debtor obtained a $1 million loan from them using a written statement that contained false representations about his financial condition. The Debtor intended to deceive the Pliuras with his false statements and knew that the information that was the substance of his false statements was material to the loan transaction and to the Pliuras. The Pliuras reasonably relied on the Debtor's false statements. For these reasons, the entirety of the Debtor's obligations pursuant to the $1 million Note signed on October 29, 2010, will be excepted from his discharge.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ###